

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Orig

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
8/15/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAV _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| DAVID GANDARA and ALBERTO AGUSTIN ORTIZ | Case No.   2:22-mj-03180-DUTY |
| Defendants | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of May 10, 2022 in the county of Los Angeles in the Central District of California, the

defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Brandice A. Olmos*
*Complainant's signature*

Brandice A. Olmos, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   August 15, 2022                 _____
                                                      *Judge's signature*

City and state:   Los Angeles, California        Honorable Gail J. Standish, U.S. Magistrate Judge
                                                            *Printed name and title*

AUSA: Elia Herrera (x2024)

## AFFIDAVIT

I, Brandice A. Olmos, being duly sworn, declare and state as
follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal
complaint against and arrest warrants for DAVID GANDARA
("GANDARA"), and ALBERTO AGUSTIN ORTIZ ("ORTIZ"), for a
violation of 21 U.S.C. § 841(a)(1) (distribution of a controlled
substance).

2.    This affidavit is also made in support of applications
for warrants to search the following:

        a.    The person of DAVID GANDARA as described more
fully in Attachment A-1.

        b.    The person of ALBERTO AGUSTIN ORTIZ as described
more fully in Attachment A-2.

3.    The requested search warrants seek authorization to
seize evidence, fruits, or instrumentalities of violations of 21
U.S.C. §§ 841(a)(1) (possession with intent to distribute and
distribution of a controlled substance) and 846 (conspiracy and
attempt to distribute controlled substances); 18 U.S.C.
§§ 922(g) (prohibited person in possession of a firearm), 924(c)
(possession of a firearm in furtherance of a drug trafficking
crime), and 922(a)(1)(A) (engaging in the business of dealing in
firearms without a license); and 26 U.S.C. § 5861(d) (possession
of unregistered firearms) (the "Subject Offenses"), as described
more fully in Attachment B.  Attachments A-1, A-2, and B are
incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only and all dates are approximate.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with the Bureau of Alcohol,
Tobacco, Firearms, and Explosives ("ATF"), United States
Department of Justice, and have been so employed since August
2021.  Prior to being employed as an ATF Special Agent, I was a
student intern for the United States Marshals Service for
approximately one year.

6.    I graduated from Eastern Michigan University with a
Bachelor of Arts degree in Criminology, while receiving a full
athletic and academic scholarship.  I also graduated from
California Baptist University with a Master of Arts degree in
Forensic Psychology.  Following my education, I graduated from
the ATF's Special Agent Basic Training and from the Department
of Homeland Security's Criminal Investigator Training Program.
I have received training in the trafficking of firearms and
controlled substances, as well as the various means and methods
by which traffickers use in furtherance of firearms and

narcotics transactions.  I have also participated in multiple firearms and narcotics trafficking investigations involving the illegal sales, transfer, and possession of firearms and controlled substances.  Additionally, I participated in many aspects of firearms and gang investigations, including conducting surveillance and the use of confidential informants and undercover agents to make controlled purchases of controlled substances and/or firearms.

### III.  SUMMARY OF PROBABLE CAUSE

7.    Between December 2021 and June 2022, GANDARA sold multiple firearms, including a short barrel rifle, and approximately five pounds of methamphetamine to individuals he believed to be customers, but who were in fact undercover ATF Special Agents (the "UCs") and an ATF Confidential Informant (the "CI").[1]  ORTIZ participated in one of the controlled purchases.

---

[1] The CI is a former member of a Los Angeles based criminal street gang and has been cooperating with the ATF as part of this investigation since September 2021.  The CI has assisted investigators in multiple investigations and has continually provided credible and reliable information.  The CI receives monetary compensation for cooperating in this investigation. The CI has the following federal and state convictions: a 2008 federal conviction for 18 U.S.C. §1962 and 1963: Racketeer Influenced and Corrupt Organizations Conspiracy, resulting in 23 months in federal prison and three years of supervised release; and a 1998 state felony conviction for possession of a controlled substance, resulting in five days in county jail and probation.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    ATF Identifies GANDARA as a Methamphetamine Dealer**

9.    In September 2021, the CI contacted a UC and advised that he/she was browsing through an internet chatroom on a mobile social media platform when he/she saw an individual with the username "tobrazy13" offering methamphetamine for sale to everyone in the chatroom.  At the direction of the ATF, the CI exchanged private messages with "tobrazy13" to inquire about purchasing methamphetamine.

10.    On September 25, 2021, "tobrazy13" provided the CI with the telephone number 323-691-6376 and informed the CI that he was from the Florencia 13 gang and the Locos click.  ATF Special Agent Duncan searched law enforcement databases for that phone number, and identified it as connected to GANDARA.

**B.    On December 21, 2021, GANDARA Sells Methamphetamine to the CI and UC**

11.    Based on my review of text messages and recorded phone conversations, I know that between October 26, 2021, and December 21, 2021, GANDARA exchanged text messages and had phone conversations with the CI to arrange an in-person meeting to sell methamphetamine to the CI and a UC.  In those communications, GANDARA agreed to meet the CI and UC on December 21, 2021, at a predetermined location to sell them two ounces of methamphetamine for $450.

12.   On December 21, 2021, GANDARA met with the CI and an ATF UC at a predetermined location in the County of Los Angeles (the "UC Location").[2]  Based on my review of the audio-video recording of that meeting, I know that at approximately 1:38 p.m., the CI opened the door and let GANDARA into the UC Location.  While at the UC Location, GANDARA handed the UC two small clear plastic bags containing approximately 56 grams of suspected methamphetamine, for which the UC provided GANDARA $450.

13.   Following the purchase, the CI and GANDARA exited the UC Location together and the CI drove GANDARA to a public transportation station where the CI dropped GANDARA off.

14.   The CI wore an audio recording device during the meeting.  Based on my review of the audio recording, during the drive, the CI asked GANDARA if he could get firearms for the CI in the future as well, to which GANDARA replied that he could and asked the CI if there were particular types of firearms the CI was looking for.  The CI said it didn't matter what type of firearms he was selling.

### C.   On December 29, 2021, GANDARA Sells Methamphetamine to the CI and a UC

15.   Based on my review of text messages and recorded phone conversations, I know that between December 21, 2021, and December 29, 2021, GANDARA exchanged text messages and had phone conversations with the CI to arrange another in-person meeting to sell methamphetamine to the CI and a UC.  In those

---

[2] All meetings at the UC location are audio and video recorded.

communications, GANDARA agreed to meet the CI and UC on December 29, 2021, at the UC Location to sell them four ounces of methamphetamine for $900 and a firearm for $1,200.

16.  On December 29, 2021, GANDARA met with a UC and the CI at the UC Location.  Based on my review of the audio-video recording of that meeting, I know that at approximately 2:35 p.m., GANDARA arrived at the UC Location while carrying a small black bag.  Once inside the UC Location, GANDARA removed from his black bag, and handed to the UC, a plastic bag containing approximately 121 grams of suspected methamphetamine, for which the UC provided GANDARA $900.

17.  Shortly after the transaction, the UC and GANDARA exchanged text messages regarding a pistol that GANDARA had previously offered to sell to the CI for $1,200.  GANDARA said that he was unable to contact the source of that firearm prior to the meeting.  GANDARA said that he was in a hurry because he had someone waiting for him outside the UC Location.  The UC then asked GANDARA if he could lower the price for future methamphetamine transactions if the UC were to purchase methamphetamine on a regular basis, and GANDARA said he could. GANDARA said he could potentially obtain pound quantities of methamphetamine to sell to the UC.

18.  Following this conversation, a camera located outside the UC Location captured GANDARA exiting the UC Location by foot and entering the driver seat of a blue Nissan that was parked outside the UC location.  Shortly after entering the vehicle, GANDARA sent a text message to the CI indicating that the CI and

the UC owed GANDARA additional money to reimburse him for gas.
The UC then exited the UC Location, approached the driver side
of the blue Nissan, and paid GANDARA $40.

19.  At this time, the UC saw a Hispanic male in the front
passenger seat of the vehicle.  GANDARA then drove the blue
Nissan out of the parking lot and surveillance ended.

**D.    On January 12, 2022, GANDARA Sells Methamphetamine to the CI and a UC**

20.  Based on my review of text messages and recorded phone
conversations, I know that between December 29, 2021, and
January 12, 2022, GANDARA exchanged text messages and had phone
conversations with the CI to arrange another in-person meeting
to sell methamphetamine to the CI and a UC.  In those
communications, GANDARA agreed to meet the CI and UC on January
12, 2022, at the UC Location to sell them four ounces of
methamphetamine for $900.

21.  On January 12, 2022, GANDARA met with a UC and the CI
at the UC Location.  Based on my review of the audio-video
recording of that meeting, I know that at approximately 2:20
p.m., GANDARA arrived at the UC Location.  Once inside the UC
Location, GANDARA took a plastic bag out from his right shorts
pocket, containing approximately 118 grams of suspected
methamphetamine, and handed it to the UC.  The UC provided
GANDARA $900 for the methamphetamine.  The UC also gave GANDARA
$60 for gas.

22.  While inside the UC Location, the CI asked GANDARA
about a potential source of firearms that GANDARA previously

mentioned via recorded text message on December 27, 2021.
GANDARA and the UC discussed what type of firearms GANDARA's
source could obtain.  GANDARA said he would ask his source.  The
meeting concluded shortly thereafter and GANDARA exited the UC
location.  Upon exiting, a camera located outside the UC
location captured GANDARA returning to his vehicle, a gray Acura
sedan.

   **E.   On January 21, 2022, GANDARA Sells Firearms to the CI
          and Two UCs**

   23.  Based on my review of text messages, I know that on
January 20, 2022, GANDARA texted the CI saying that GANDARA had
firearms to sell to the CI.  GANDARA then sent pictures to the
CI of the firearms and agreed to meet the CI the following day
to sell the firearms.

   24.  On January 21, 2022, GANDARA met with two UCs and the
CI at the UC Location.  Based on my review of the audio-video
recording of that meeting, I know that at approximately, 4:54
p.m., GANDARA arrived at the UC Location in the same gray Acura
from the previous deal.  Once inside the UC Location, GANDARA
placed a black cardboard pistol box on a table near the UC.  The
UC opened the box and removed a JA Industries LLC, Model JA
Nine, 9mm pistol, turquoise in color, bearing serial number
462453.  The box had the matching serial number and contained
the firearm and two magazines.  The UC gave GANDARA $1,400 for
the firearm.

   25.  At the UC Location, GANDARA said that his source could
obtain more firearms from Las Vegas and could potentially lower

the price of the firearms in the future.  GANDARA asked the UCs
when they would be able to purchase more firearms.  The UCs said
that they could purchase more firearms the following week.  The
UCs also said that they would like to purchase more than one
firearm at a time and told GANDARA that they intended to re-sell
the firearms.  The UCs said that they would like GANDARA to
lower the price of the firearms in the future to ensure the UCs
could make a profit on the resale in the future.  The meeting
concluded shortly thereafter, and a surveillance unit witnessed
GANDARA enter the gray Acura and drive out of the UC Location.

**F.   On March 31, 2022, GANDARA Sells a Short Barrel Rifle,
a Pistol, and Methamphetamine to the CI and UC**

26.  Based on my review of text messages and recorded phone
conversations, I know that between January 21, 2022, and March
31, 2022, GANDARA exchanged text messages and had phone
conversations with the CI to arrange another in-person meeting
to sell methamphetamine to the CI and a UC.  In those
communications, GANDARA agreed to meet the CI and UC on March
31, 2022, at the UC Location to sell them a half pound of
methamphetamine for $1,500 and a firearm for $1,200.

27.  On March 31, 2022, GANDARA met with a UC and the CI at
the UC Location.  At approximately 1:00 p.m., a surveillance
unit witnessed GANDARA standing outside the UC Location.  The CI
then opened the door to the UC location and GANDARA entered.
Based on my review of the audio-video recording of that meeting,
I know that once inside the UC location, GANDARA retrieved two
plastic baggies from his right front sweatshirt pocket

containing approximately 299 grams of suspected methamphetamine
and handed them to the UC.  GANDARA also handed the UC a pistol
box containing a SCCY, model CPX-1, 9mm pistol, turquoise in
color, bearing serial number C225867.  The UC gave GANDARA
$1,500 for the methamphetamine and $1,200 for the pistol.

28.  During the meeting, GANDARA said that the source of
the pistol was the same source as the last time.  GANDARA then
said that an AR type rifle was for sale, and he could obtain it
that day.  GANDARA told the CI he would call him/her later that
day regarding the AR type rifle.  A surveillance unit witnessed
GANDARA exit the UC Location shortly thereafter and walk
directly to a black Chrysler 300.

29.  Shortly thereafter, GANDARA sent the CI a picture of a
short barrel rifle via text message.  GANDARA told the CI that
GANDARA was willing to sell the rifle right away.  The CI told
GANDARA that they were willing to pay $2,000 for the rifle to
which GANDARA agreed.  The CI then told GANDARA that they needed
about an hour in order to get the cash for the rifle.  GANDARA
agreed to return in an hour and sell the rifle to the CI and UC.

30.  Later that same date, at approximately 2:39 p.m.,
surveillance units witnessed GANDARA return to the UC Location
in the black Chrysler 300.  GANDARA exited the rear passenger
seat of the vehicle carrying a 7.62 caliber, AR type, short
barrel rifle,[3] bearing no serial number, as well as one magazine,

---

[3] The AR-15 type, 7.62x39mm caliber short-barrel rifle
recovered from GANDARA on March 31, 2022, has been examined by
SA Alexander Liwienski, an ATF Firearms and Ammunition
*(footnote cont'd on next page)*

concealed in a plastic trash bag and a sweatshirt.  Based on my review of the audio-video recording from inside the UC Location, GANDARA walked inside the UC Location and handed the rifle to the UC.  The UC gave GANDARA $2,000 for the rifle.

31.  The UC referenced distributing rifles to other people and discussed future transactions with GANDARA.  The meeting concluded shortly thereafter.

### G.  On April 13, 2022, GANDARA Sells Methamphetamine to the CI and a UC

32.  Based on my review of text messages and recorded phone conversations, I know that between March 31, 2022, and April 13, 2022, GANDARA exchanged text messages and had phone conversations with the CI to arrange another in-person meeting to sell methamphetamine to the CI and a UC.  In those communications, GANDARA agreed to meet the CI and UC on April 13, 2022, at the UC Location to sell them a half pound of methamphetamine for $1,500.

33.  On April 13, 2022, GANDARA met with a UC and the CI at the UC Location.  Based on my review of the audio-video recording of that meeting, I know that at approximately 3:20 p.m., GANDARA arrived at the UC Location.  Once inside the UC Location GANDARA retrieved a plastic bag from his right front pocket containing approximately 232 grams of methamphetamine and

---

Interstate Nexus Expert.  SA Alexander Liwienski concluded that the barrel length of the rifle was less than 16 inches and therefore the rifle is a short barrel rifle as defined in Title 26 U.S.C. § 5845(a)(3).

handed it to the UC.  The UC provided $1,500 to GANDARA in exchange for the methamphetamine.

34.  The UC and GANDARA discussed future proposed methamphetamine sales in larger quantities, ranging from two to three pounds.  GANDARA was not specific on the price but said he would give the UC a good price on larger quantities.  The meeting concluded shortly thereafter.  Upon exiting the UC Location, GANDARA entered the passenger side of a green four-door Jeep Wrangler.

**H.   On April 19, 2022, GANDARA and ORTIZ Sell a Firearm and Narcotics to the CI and UC**

35.  Based on my review of text messages and recorded phone conversations, I know that between April 13, 2022, and April 19, 2022, GANDARA exchanged text messages and had phone conversations with the CI to arrange another in-person meeting to sell methamphetamine to the CI and a UC.  In those communications, GANDARA agreed to meet the CI and UC on April 19, 2022, at the UC Location to sell them three pounds of methamphetamine for $6,900 and a 1911 style pistol for $1,700.

36.  On April 19, 2022, GANDARA met with a UC and the CI at the UC Location.  Based on my review of the audio-video recording of that meeting, I know that at approximately 5:03 p.m., GANDARA arrived at the UC Location in the black Chrysler 300.  Once inside the UC Location, GANDARA handed the UC a brown plastic bag containing three individually wrapped packages of methamphetamine and a privately manufactured, 1911 style, 45-caliber pistol, bearing no serial number.  The combined weight

of the packages of methamphetamine was approximately three pounds.  The UC gave GANDARA $6,900 for the methamphetamine and $1,700 for the firearm.

37.  The UC and GANDARA discussed whether GANDARA could lower the price of methamphetamine for future transactions. GANDARA said that he would discuss the price with his source, but he would not bring his source to future transactions.  The UC asked GANDARA if he could get more firearms, and GANDARA said that he could.

38.  Shortly thereafter, a surveillance unit witnessed GANDARA, the CI, and the UC walk back to GANDARA's car, the black Chrysler 300.  Upon approaching the black Chrysler 300, the CI asked GANDARA's associate, who was seated in the driver's seat, if he wanted to check out a hidden compartment in the UC's vehicle.  GANDARA's associate agreed and exited the black Chrysler 300 to go look at the hidden compartment.  Shortly after, GANDARA's associate returned to the driver side of the black Chrysler 300, removed the driver air conditioning vent, and showed the UC a basic hidden compartment in the vehicle. The UC saw a small plastic baggie that appeared to contain a white powdery substance that was suspected narcotics.  The meeting then concluded and GANDARA and his associate exited the UC Location.

39.  Following the undercover purchase with GANDARA and his associate, ATF SAs queried the black Chrysler 300, in law enforcement databases and found that the vehicle had previously been traffic stopped by Ventura County Sheriff's Department.

During the traffic stop, Alberto Agustin ORTIZ was identified as one of the occupants in the vehicle.  ATF SAs showed the UCs present at the controlled sale a California Department of Motor Vehicles picture of ORTIZ, at which point both UCs positively identified GANDARA's associate as ORTIZ.

### I.   On May 10, 2022, GANDARA and ORTIZ Sell Methamphetamine to the CI and UC

40.  Based on my review of text messages and recorded phone conversations, I know that on April 29, 2022, GANDARA informed the CI that the price per pound of methamphetamine would be $2,100.  In early May 2022, the CI and GANDARA continued discussing setting up a methamphetamine deal for two pounds at a price of $2,100 per pound.  On May 8, 2022, the CI asked GANDARA if the CI could purchase two pounds of methamphetamine and a firearm on May 10, 2022.  GANDARA told the CI that he did not have a firearm that he could sell the CI, but that he would sell the CI two pounds of methamphetamine.

41.  On May 10, 2022, GANDARA met with a UC and the CI at the UC location, in the County of Los Angeles.  Based on my review of the audio-video recording of that meeting, I know that at approximately 5:21 p.m., GANDARA and ORTIZ arrived at the UC Location in the black Chrysler 300.  Once inside the UC location, GANDARA and ORTIZ exited the vehicle and entered the lounge with the UCs and CI, where GANDARA handed the UC a dark plastic bag that contained a plastic wrapped package of suspected methamphetamine. The UC placed the package on a digital scale and saw the weight was approximately one pound.  The UC

provided GANDARA $2,100 in exchange for the suspected methamphetamine.

42.   The UCs then engaged in conversation with ORTIZ about the installation of a hidden compartment inside ORTIZ's vehicle, previously mentioned during the transaction on April 19, 2022. A UC proposed examining ORTIZ's vehicle and providing an estimate for the installation.  ORTIZ indicated he was going to purchase another car soon and would need a hidden compartment on another car.  ORTIZ indicated his current car already had a hidden compartment.  In reference to the hidden compartment in his current vehicle, ORTIZ stated that, "It's small. I could fit like a strap, a couple ounces in it."  Based on my training and experience, the term "strap" is a code word for a firearm.

43.   A UC then spoke to GANDARA about the previously discussed sale of a handgun.  GANDARA said that he did not have the firearm yet.  The meeting concluded shortly thereafter and GANDARA and ORTIZ exited the UC location.

**J.    On June 29, 2022, GANDARA Sells Narcotics to the CI and UCs**

44.   Based on my review of text messages and recorded phone conversations, I know that between May 10, 2022, and June 29, 2022, GANDARA texted the CI that he had firearms and narcotics to sell the CI.  GANDARA and the CI agreed to meet on June 29, 2022.

45.   On June 29, 2022, GANDARA met with a UC and the CI at the UC Location.  Based on my review of the audio-video recording of that meeting, I know that at approximately 5:27

p.m., GANDARA arrived at the UC Location with an unknown male passenger in a white, four-door sport utility vehicle.  The passenger remained in the vehicle.  GANDARA exited the vehicle and entered the UC Location.  Once inside the UC location, GANDARA handed the UC a plastic bag containing two Ziploc bags of suspected methamphetamine.  The UC placed the two Ziploc bags on a digital scale separately and saw that the combined weight was approximately two pounds.  The UC provided GANDARA with $3,200 in exchange for the suspected methamphetamine.

46.  GANDARA said he was still trying to obtain the ARs (firearms) that he had previously discussed selling to the CI and UC.  GANDARA said the sources of the firearms "flaked" on him at the last minute.  GANDARA said the sources of the firearms wanted $1,900 per AR-15.  Shortly thereafter, the meeting concluded, and GANDARA and his associate exited the UC Location.

**K.   Surveillance of ORTIZ's Residence**

47.  On July 20, 2022, ATF SAs conducted surveillance at ORTIZ's known residence, located at 9879 Telfair Avenue, Pacoima, CA, 91331.  This address is ORTIZ's registered address on his California Driver's License.  At approximately 12:47pm, ORTIZ exited his residence, entered the black Chrysler 300, and drove away in the vehicle.  This is the same vehicle ATF SAs have witnessed GANDARA and ORTIZ arrive in at previous operations.

**L.   Identification of a Firearm Purchased From GANDARA as Requiring Registration Under Title 26 U.S.C. § 5845**

48.   In March 2022, ATF Interstate Nexus Expert Alexander Liwienski examined the privately manufactured 7.62x39 caliber short barrel rifle, bearing no serial number, that GANDARA sold to the UC on March 31, 2022.  Based on the measurement of the barrel length of the firearm, SA Alexander Liwienski concluded that the barrel length of the rifle was less than 16 inches and therefore the rifle is a short barrel rifle as defined in Title 26 U.S.C. § 5845(a)(3).

49.   Additionally, an ATF Special Agent checked ATF databases to identify if GANDARA had a tax stamp registering him as an owner of a short barrel rifle, and determined that GANDARA does not have such a tax stamp, and, therefore, he could not legally possess this type of firearm.

**M.   GANDARA Does Not Hold a Federal Firearms License**

50.   According to Kimberly Rowland, a supervisor of the Federal Firearms Licensing Center, she conducted a search of law enforcement databases and confirmed that GANDARA did not hold a Federal Firearms License ("FFL") in the State of California between the dates of January 1, 2022, and April 7, 2022.  As such, GANDARA does not have a license to engage in the business of dealing in firearms.

**N.   GANDARA is a Convicted Felon**

51.   Based on ATF Special Agents' review of GANDARA's criminal history records, he has previously been convicted of

the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about August 20, 2013, GANDARA was convicted of a felony for a violation of California Health & Safety Code Section 11377(a), Possession of a Controlled Substance, in the Superior Court of the State of California, County of Los Angeles, Case Number BA415394;

b.   On or about January 16, 2014, GANDARA was convicted of a felony for a violation of California Penal Code Section 459, Second Degree Burglary of a Vehicle, in the Superior Court of the State of California, County of Los Angeles, Case Number BA420661;

c.   On or about January 16, 2014, GANDARA was convicted of a felony for a violation of California Penal Code Section 496(a), Receiving Stolen Property, in the Superior Court of the State of California, County of Los Angeles, Case Number BA420661;

d.   On or about October 16, 2014, GANDARA was convicted of a felony for a violation of California Vehicle Code Section 1085(a), Driving or Taking a Vehicle Without Consent, in the Superior Court of California, County of Los Angeles, Case number BA432250; and

e.   On or about September 03, 2016, GANDARA was convicted of a felony for a violation of California Penal Code Section 21810, Possession of Metal Knuckles, in the Superior Court of California, County of Los Angeles, Case Number BA449914.

### O.    ORTIZ is a Convicted Felon

52.    Based on ATF Special Agents' review of ORTIZ's criminal history records, he has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.    On or about September 30, 2016, ORTIZ was convicted of a felony for a violation of California Health & Safety Code Section 11378, Possession of Controlled Substance for Sale, in the Superior Court of California, County of Los Angeles, Case Number XNVPA08587702; and

b.    On or about May 29, 2019, ORTIZ was convicted of a felony for a violation of California Health & Safety Code Section 11378, Possession of Controlled Substance for Sale, in the Superior Court of California, County of Los Angeles, Case Number XNVPA09127901.

### P.    Drug Tests

53.    All suspected methamphetamine that GANDARA sold to the CI and UCs between December 2021 and June 2022, as discussed above, were sent to the DEA lab for analysis.  DEA lab reports have concluded that all of the substances were in fact methamphetamine.

### Q.    Interstate Nexus

54.    On August 8, 2022, ATF Interstate Nexus Expert Alexander Liwienski examined the SCCY Industries model CPX-1, 9mm caliber pistol, bearing serial number C255867, and confirmed that the handgun was manufactured by SCCY Industries in Florida.

Because the handgun was found in California, I believe that it
has traveled in and affected interstate commerce.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

55.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus

may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

        h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

    56.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

        a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

22

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]</u>

57.    Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

58.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.     Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.     Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

59.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.     Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

60.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GANDARA OR ORTIZ's's thumb- and/or fingers on the devices; and (2) hold the devices in front of GANDARA OR ORTIZ's's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

61.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.        CONCLUSION

62.   For all of the reasons described above, there is probable cause to believe that DAVID GANDARA ("GANDARA"), and ALBERTO AGUSTIN ORTIZ ("ORTIZ"), have committed a violation of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

63.    There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person of DAVID GANDARA described in Attachment A-1, and the person of ALBERTO AGUSTIN ORTIZ described in Attachment A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __15th__ day of
August, 2022.

_____
HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE


28